1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **SOUTHERN DISTRICT OF CALIFORNIA**
10  UNITED STATES OF AMERICA,              CASE NO. 13CR668-WQH
11                          Plaintiff,     ORDER
            vs.
12  ROBERT KHETHER MCKANY,
13                          Defendant.
14  HAYES, Judge:

15          The matters before the Court are: 1) Defendant's motion to suppress statements

16  (ECF No. 15); and 2) Defendant's motion to suppress evidence (ECF No. 16).

17  <u>Defendant's motion to suppress statements</u> (ECF No. 15)

18          On October 27, 2011, Homeland Security Investigations (HSI) Agent Sherman

19  Wooden applied for and received a federal warrant to search Defendant's residence at

20  1266 Sumner Avenue, Apartment B, El Cajon, California for evidence, contraband, and

21  property relating to child pornography.  (ECF No. 25-8).

22          On November 2, 2011, a group of fourteen HSI agents executed the search

23  warrant at the residence.  At approximately 6:30 a.m., HSI agents made contact with

24  Kether McKany, Defendant's father, as he left the residence on his way to work.

25  Agents asked Kether McKany to open the door and he replied that the door was

26  unlocked.  An agent began to search Kether McKany's car and told him to wait in the

27  garage.  Kether McKany was interviewed in the garage by agents for approximately

28  fifteen minutes.  Kether McKany then left the residence for work.

During Kether McKany's interview, the agents entered the residence through the garage and made their way upstairs to Defendant's bedroom. Agents wore tactical vests with service weapons drawn. It is standard procedure for HSI agents to wear tactical vests and draw service weapons for the safety of the agents when initiating the execution of a search warrant. In this case, agents were aware that Defendant possessed multiple firearms.

When the agents reached Defendant's bedroom they discovered the door was locked. Agents knocked on the bedroom door and identified themselves as law enforcement agents. Defendant opened the bedroom door dressed in boxer briefs. Defendant was removed from his bedroom and handcuffed. Agents picked up a pair of jeans and held them for Defendant to step into.

Defendant was seated on a couch in the living room area of the residence while agents completed the initial security sweep. After agents finished the security sweep, the agents removed their tactical vests and holstered their service weapons. The security sweep lasted approximately fifteen minutes.

After the completion of the security sweep, Agent Wooden, the lead agent, came into the living room and removed Defendant's handcuffs. Agent Wooden was wearing a concealed recording device and the entirety of his interactions with Defendant were recorded. Defendant initially asked the agent, "Can I get some pictures for my Facebook?" and remarked, "Sorry, I couldn't resist." (ECF No. 32-1 at 2). Agents provided Defendant with a shirt and sandals. Agent Wooden gave Defendant the search warrant and an opportunity to read the warrant. Defendant asked to go to the bathroom and stated, "I don't care if it's outside on the grass, if everybody has to watch me, I don't give a shit, I just need to pee." *Id.* at 3. A male agent escorted Defendant to the bathroom in his father's bedroom and remained present outside the open door while Defendant urinated.

Agents Wooden and Myers arranged three chairs in the father's bedroom and sat down with Defendant while other agents conducted the search. Both agents had

1   removed their tactical vests, and their service weapons were holstered and concealed

2   underneath their shirts.  Defendant was seated closest to the door and the agents were

3   seated across from him.  No agent was seated between Defendant and the door.  Agent

4   Wooden identified himself and Agent Myers.  Agent Wooden gave Defendant a copy

5   of the search warrant, and stated, "[T]here's [] probable cause that there's child

6   pornography in the house."  *Id.* at 5.   Agent Wooden then asked Defendant for

7   biographical information including his name, address, date of birth, and occupation.

8   Agent Myers closed the bedroom door.  After completing biographical information,

9   Agent Wooden repeated that they had a warrant to search the residence.

10      Agent Wooden: Alright, like I said, search warrant, this is your copy, [] so
        you can do whatever you want [] with it. Probable cause- child
11      pornography in the house. [] I would like to talk to you a little bit about
        what's going on. You're not under arrest, nobody, your father's not under
12      arrest. You can leave whenever you want to, like I say, we have a few
        questions, things we want to clear up. I appreciate it, we appreciate it if
13      you'd want to talk to us, but like I say, you don't have to. If you decide to
        answer questions, great. At any point in time you can say 'hey I don't
14      want to answer this question' or you know, 'I don't want to talk any more'
        or whatever and then the interview will be over. Like I said, you're not
15      under arrest but we just wanted to, you know, some discrepancies in our
        case, we just wanted to figure out what's going on.
16      Defendant: Ok.
        Agent Wooden: Ok so, are you ok to talk to us?
17      Defendant: Well, it's let's . . . like what's going on? Like, am I in some
        sort of trouble? I mean, what's . . .
18      Agent Wooden: So, I mean, I want to make sure, is that[], are you okay to
        talk to us? Is that a yes? Just so . . .
19      Defendant: I'll talk to you a little bit.
        Agent Wooden: Ok.
20      Defendant: Let's . . . I've never had anything like this happen before . . .
        Agent Wooden: No, yeah.
21      Defendant: I've never done anything really wrong . . . I've never had the
        house raided. I've never been arrested. I've, the only crime I've ever
22      committed and still commit, is I speed.
        Agent Wooden: No, no speeding, we're all guilty of that at some point in
23      time. []Ok, so, I'll start off, I appreciate you talking to us. Basically[] there
        is an internal investigation that we conducted and that [] discovered that
24      there was, [] trading of child pornography on telenetwork and coming out
        of for different residences or whatever, [] and  one of the residences was
25      [] this one.

26   *Id.* at 9-10.  Agent Wooden questioned Defendant regarding his involvement in child

27   pornography on his computer.  Defendant responded to questioning.  Defendant did not

28   request to stop the questioning at any point during the interview.  The audio recording

of the interview indicates that Defendant answered the questions without hesitation. Agent Wooden did not inform Defendant of his *Miranda* rights[1] during the interview. The questioning began at 6:52 a.m. and ended at 7:48 a.m..

At the conclusion of the interview, Agent Wooden explained that the HSI agents were going to finish the search of the residence, seize any and all electronic items, and provide Defendant with a list of the items seized. Agent Wooden told Defendant that he anticipated the search would be completed within an hour. Agent Wooden asked Defendant if he had any additional questions and told Defendant that he was free to leave the residence. Defendant asked if he could make breakfast for himself in the kitchen during the search. Agent Wooden stated that Defendant would have to stay in a single location with an agent if he chose to remain at the residence for officer safety reasons. After the interview, agents took Defendant downstairs to sit on a couch in the garage.

**Contentions of Parties**

Defendant moves the Court to suppress his statements made at the time of the search. Defendant contends that he was in custody for purposes of *Miranda* based upon the police dominated environment. Defendant asserts that "the agents controlled his movements, his access to communication, and the physical setting of the interrogation." (ECF No. 15-1 at 7). Defendant contends that the agents' failure to give Defendant *Miranda* warnings before the interrogation violated Defendant's Fifth Amendment rights and that Defendant's statements must be suppressed.

The Government contends that the consensual, non-custodial interview did not require *Miranda* warnings. The Government asserts that Agent Wooden told Defendant that he was not under arrest, that Defendant did not have to talk to the agents, and that Defendant was free to leave whenever he wanted. The Government asserts that the

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.").

physical surroundings and the agents' actions show that the in-home interview was non-custodial and that *Miranda* warnings were not required.

### Applicable Law

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1969), the Supreme Court held that law enforcement officers must advise a suspect of his or her Fifth Amendment rights prior to an interrogation when a suspect is "in custody." *Id.* at 444–445. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Such a deprivation of freedom occurs when "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotation marks and citation omitted). To determine whether a suspect has been "deprived of his freedom of action in any significant way[,]" and thus is in custody, the Court must examine the totality of the circumstances surrounding the interrogation. *Miranda*, 384 U.S. at 444; *see also Thompson v. Keohane,* 516 U.S. 99, 112 (1995) (the determination of whether a suspect is "in custody" is a discrete inquiry into the circumstances surrounding the interrogation). The analysis of the circumstances of the interrogation is an objective one, "and is not based upon the subjective views of the officers or the individual being questioned." *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) (internal quotation marks and citation omitted).

In *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), the Court of Appeals for the Ninth Circuit adopted an "approach of using the 'police-dominated atmosphere' as the benchmark for custodial interrogation in locations outside of the police station [a]s consistent with the Supreme Court's adaptations of *Miranda* to these types of locations." *Id.* at 1083. In determining whether a suspect was in custody, the Court of Appeals noted that "we first examine the totality of the circumstances

surrounding the interrogation.  We then ask whether a reasonable person in those circumstances would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 1082 (internal quotation marks and citations omitted).  In *Craighead*, eight law enforcement officers, representing three different agencies, executed a search warrant of the defendant's home for child pornography. *Id.* at 1078.  Some of the agents continued to wear flak jackets after the initial sweep of the residence and a few had their firearms unholstered in the defendant's presence. *Id.*  The agents asked to talk with the defendant and told the defendant that he was not under arrest, that he was free to leave, and that any statement he made would be voluntary. *Id.*  The interview occurred in a small and cluttered storage room in the back of the defendant's residence. *Id.*  A detective present in the storage room during the interview was dressed in a flack jacket and had a sidearm showing. *Id.*  The defendant testified that he did not feel free to leave during the interview, because the detective was armed and was blocking the only exit. *Id.* at 1079.  The defendant also testified that he did not feel free to leave because he was unsure whether he had collective permission from all of the agencies to leave. *Id.*

The Court of Appeals explained:

> An interrogation conducted within the suspect's home is not *per se* custodial. *See Beckwith v. United States,* 425 U.S. 341, 342-343, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).  On the contrary, courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature. *United States v. Ritchie,* 35 F.3d 1477, 1485 (10th Cir.1994); 2 WAYNE R. LAFAVE CRIMINAL PROCEDURE § 6.6(e) (3d ed.2007).  The element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings. *See Orozco v. Texas,* 394 U.S. 324, 326, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969).  Nevertheless, an interrogation in the suspect's home may be found to be custodial under certain circumstances. *See id.* at 325-326, 89 S.Ct. 1095 (holding that an interrogation was custodial where four police officers arrived at the suspect's home, entered the bedroom, and behaved as though the suspect was not free to leave while he was questioned).
>
> *Miranda* held that warnings were required when the person being interrogated was "in custody at the station or otherwise deprived of his freedom of action in any significant way." 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  The Court held that certain essential salient features made situations in which the suspect was "otherwise deprived of his freedom of action" similar to those in which the suspect was taken into custody at the police station, *id.,* specifically, "incommunicado interrogation of individuals in a police-dominated atmosphere." *Id.* at 445

(stating that the salient feature was that the suspect was "cut off from the outside world"). Drawing on this reasoning, when applying *Miranda* to the task of sorting a non-custodial in-home interrogation from a custodial one, our analysis considers the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a police-dominated atmosphere."

*Id.* at 1083.   The Court of Appeals applied a four-factor test to determine the circumstances under which an interrogation by law enforcement officers in a suspect's home becomes custodial and requires *Miranda* warnings.   The Court of Appeals considered: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." *Id.* at 1084.

The Court of Appeals concluded:

Considering the totality of the circumstances as analyzed under the four factors listed above, we find that the fact that SA Andrews told Craighead that he was free to leave weighs in favor of finding he was not in custody, but the other three factors lead us to the conclusion that Craighead was in custody for purposes of *Miranda*. Craighead's home had become a police-dominated atmosphere. Escorted to a storage room in his own home, sitting on a box, and observing an armed guard by the door, Craighead reasonably believed that there was simply nowhere for him to go.

*Id.* at 1089.

## Analysis

1. Presence of Law Enforcement

The Court of Appeals in *Craighead* first considered "the number of law enforcement personnel and whether they were armed." *Id.* at 1084. The Court of Appeals stated that "if the suspect sees the officers unholstering their weapons within his home, the suspect may reasonably believe that his home is no longer safe from the threat of police force. In short, the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere." *Id.* at 1085. In *Craighead*, the Court of Appeals noted that the presence of three separate law enforcement agencies left the defendant to doubt whether

1   the lead agent spoke collectively for all the agencies involved in the search.

2          In this case, fourteen agents from a single law enforcement agency executed the
3   search warrant at Defendant's residence.  After the initial safety sweep of the residence,
4   the agents conducting the search removed their tactical vests and holstered their
5   weapons.  Agent Wooden testified that both he and Agent Myers took additional steps
6   to cover their weapons with their shirts while interviewing Defendant.  The record
7   establishes that Agent Wooden was the lead agent throughout the search and the
8   interview.  Agent Wooden gave a copy of the search warrant to Defendant and explained
9   the reason for the search.  Agent Wooden asked Defendant if he would answer his
10  questions and answered all questions by Defendant.  Agent Wooden spoke for the entire
11  search team when Agent Wooden told Defendant that he was not under arrest and that
12  he was free to leave.  The Court finds that the HSI agents took reasonable precautions
13  to minimize the show of force during the interview and to clearly communicate to
14  Defendant that the agents would not prevent him from leaving the interview and/or the
15  residence.  *See e.g., United States v. Wolf*, 472 F. App'x. 548, 550 (9th Cir. 2012)
16  (affirming non-custodial finding by district court noting that "[n]one of the officers
17  openly carried weapons."); *United States v. Ivers*, 430 F. App'x. 573, 574 (9th Cir. 2011)
18  (affirming non-custodial finding by district court stating that "[s]everal facts distinguish
19  this case from *Craighead*, including the number of law enforcement officers, the
20  officers' style of dress, the fact that the officers did not display weapons, and the location
21  of the interview.").  *Compare Craighead*, 539 F.3d at 1085 ("All of the law enforcement
22  personnel were armed, some wore protective gear, and some of them unholstered their
23  firearms in Craighead's presence.").

24  2. Restraint

25          The Court of Appeals in *Craighead* next considered "whether the suspect was at
26  any point restrained, either by physical force or by threats."  *Id.*  The Court of Appeals
27  noted that "[r]estraint amounting to custody may also be inferred where law enforcement
28  officers permit the suspect to move around the house for brief periods but insist on

1  escorting and monitoring him at all times." *Id.*

2  In this case, the record establishes that Defendant was handcuffed initially during
3  the safety sweep of the residence.  After approximately fifteen minutes, Defendant's
4  handcuffs were removed.  Defendant was informed that the agents were searching the
5  home pursuant to a warrant and was provided with a copy of the search warrant.  Agent
6  Wooden clearly informed Defendant that Defendant was not required to answer
7  questions and that Defendant was free to leave the residence at the start of the interview.
8  After the interview, Defendant was again informed that he was free to leave the
9  residence.  Having chosen to stay at the residence, Defendant was not allowed to move
10 freely in the residence unattended by law enforcement while the search was ongoing for
11 officer safety reasons.  The search lasted approximately two hours and Defendant was
12 given the option to leave the residence throughout the search.  The Court finds that these
13 facts weighs against a finding that Defendant was "in custody" at the time of the
14 interview.  The Court concludes that handcuffing an individual during the initial safety
15 sweep of a residence, and restricting movement of an individual otherwise free to leave
16 a residence during the execution of a valid search warrant for officer safety reasons, do
17 not support a finding of custodial detention.  *See, e.g., United States v. May*, 2:08-CR-
18 0012-PMP-GWF, 2009 WL 1542557, at *17 (D. Nev. May 29, 2009) (finding that the
19 defendant was not "in custody" for purposes of *Miranda*, because he was advised that
20 he could leave the residence at any time, but if he elected to remain in the residence, he
21 would have to "stay seated where the agents asked to him sit").

22 3. Isolation

23 The third factor considered in *Craighead* was "whether the suspect was isolated
24 from others." 539 F.3d at 1086.  "'A frequently recurring example of police domination
25 concerns the removal of the suspect from the presence of family, friends, or colleagues
26 who might lend moral support during the questioning and deter a suspect from making
27 inculpatory statements. . . .'" *Id.* at 1087 (quoting *United States v. Griffin*, 922 F.2d
28 1343, 1352 (8th Cir. 1990)).  The Court of Appeals explained that "[t]he Supreme Court

highlighted isolation from the outside world as perhaps the crucial factor that would tend to lead a suspect to feel compelled to provide self-incriminating statements." *Id.* at 1086–87 (citing *Miranda*, 384 U.S. at 445–446). The Court of Appeals noted that the fact that the defendant's colleague was not permitted in the storage room during the interview reinforced the "understanding that the FBI controlled Craighead's environment." *Id.* at 1087.

In this case, Defendant was questioned in his father's bedroom. No portion of the recorded interview indicates that Defendant was prevented from contacting his father or anyone else who might lend moral support. The audio recording establishes that Defendant was aware that his father had come into contact with the agents, and that Defendant did not request that his father or anyone else be present during the interview. There are no facts in this case to suggest that isolation from the outside world was a factor in Defendant's decision to answer questions. *See id.* at 1088 ("An interview conducted in a suspect's kitchen, living room, or bedroom might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere.").

4. Free To Leave

The fourth factor considered in *Craighead* was "whether the suspect was informed that questioning was voluntary and that he was free to leave or terminate the interview." *Id.* at 1087. The Court of Appeals explained:

> The mere recitation of the statement that the suspect is free to leave or terminate the interview, however, does not render an interrogation non-custodial *per se*. We must consider the delivery of these statements within the context of the scene as a whole. *See United States v. Lee*, 699 F.2d 466, 467–68 (9th Cir. 1982) (per curiam) (holding that an interrogation was custodial even though the interrogating FBI agents told the suspect that he was free to leave or terminate the interview at any time because the suspect was questioned in a closed FBI car for over an hour while police investigators searched the house). The *Miranda* test for custody does not ask whether the suspect was *told* that he was free to leave; the test asks whether "a reasonable person [would] have *felt* he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112 (emphasis added).

*Id.* at 1088.

13CR668-WQH

1      In this case, the record establishes that Agent Wooden explicitly told Defendant
2  that Agent Wooden had a search warrant for the residence and that Defendant was not
3  under arrest.  Agent Wooden told Defendant:

> You can leave whenever you want to, like I say, we have a few questions, things we want to clear up. I appreciate it, we appreciate it if you'd want to talk to us, but like I say, you don't have to. If you decide to answer questions, great. At any point in time you can say 'hey I don't want to answer this question' or you know, 'I don't want to talk any more' or whatever and then the interview will be over.

(ECF No. 32-1 at 9).  The audiotape of the interview establishes that these statements
were made in a calm and cooperative manner and that Defendant responded in a calm
and cooperative manner.  Defendant was told that he was free to leave at the initial
stages of the requested interview while Defendant was his father's bedroom.  The
bedroom was a familiar setting.  *Compare Craighead*, 539 F.3d at 1088–89 ("SA
Andrews escorted the suspect to a storage room in back of the house.  The room was
unfurnished.  SA Andrews testified that she herself was squatting on the floor, and that
Craighead was probably sitting on a box or a chair grabbed from another room.").  Agent
Myers testified that Defendant was seated in a chair closest to the bedroom door and that
both agents were seated across from Defendant, farthest away from the door.     The
bedroom door was initially open while Agent Wooden was gathering biographical data
and was later closed by Agent Myers.  Unlike in *Craighead*, there was no armed agent
blocking the only exit from the room and no evidence that Defendant felt that he was not
free to leave during the interview. *Compare Craighead*, *id.* at 1079 ("Craighead testified
that he felt that he was not free to leave because he 'would have either had to have
moved [Detective Englander] or asked him to move.'").  In this case, the recitation by
Agent Wooden that Defendant was not under arrest, that Defendant was free to leave,
and that Defendant could decide not to answer "at any point in time," as well as Agent
Wooden's delivery of the statements within the context of the scene as a whole weigh
against a finding of custodial interrogation.  (ECF No. 32-1 at 9).

5. Totality of the Circumstances

    The Court concludes that Defendant was not in custody for purposes of *Miranda*

at the time of his in-home interview.  The HSI agents took reasonable precautions to minimize the police-dominated atmosphere during the interview by removing their tactical vests and holstering their weapons.  Agent Wooden was the lead agent speaking for the entire search team when Agent Wooden told Defendant that he was not under arrest, that he was free to leave the residence, and that he did not have to answer any questions.  Defendant was informed that he could leave during the initial stages of the interview and again at the conclusion of the interview.  The audiotape recording of the interview and the transcript of the interview establish that the atmosphere of the interview was calm and cooperative throughout the interview.  Defendant did not request to terminate the interview or decline to answer any question during the interview.  Defendant was not prevented from contacting his father or anyone else who might lend moral support, and Defendant did not request that anyone else be present during the interview.

The interview occurred in the familiarity of Defendant's father's bedroom with two agents present.  No agent displayed a weapon or blocked the door in any manner.  After choosing to remain at the residence, Defendant was accompanied by an HSI agent as he moved around the residence for officer safety reasons.  The Court concludes that a person in these circumstances would reasonably believe that he or she was free to decline to answer any of the agents' questions, to terminate the in-home interview at any time, and/or to leave the house.

Defendant's motion to suppress statements is denied.

2) Defendant's motion to suppress evidence  (ECF No. 16)

The search warrant signed by the Magistrate Judge permitted the seizure of items relating to violations of the child pornography statute, in particular, "[a]ll computer systems, software, peripherals and data storage devices." (ECF No. 16-2 at 5).  Agents left Defendant's residence at approximately 9:00 a.m. on November 2, 2011.  Agents seized two flash drives and four laptop computers: a Toshiba, an HP 642-415DX, an HP Pavilion, and a Gateway.  The Affidavit in Support of the warrant provided the

following "Procedures for Electronically Stored Information":

> With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:
>
> Seizure and Retention of Instrumentalities
>
> a.  Based upon the foregoing, there is probable cause to believe that any computers and electronic storage devices encountered during this search are instrumentalities of the enumerated offenses because there is probable cause to believe that they may contain contraband and fruits of crime as provided at Rule 41(c)(2), Fed.R.Crim.P., or were used in committing crime as provided at Rule 41(c)(3).  Consequently, the computers and any other electronic storage devices are subject to seizure, retention and possible forfeiture and destruction.  Computers, other electronic storage devices and media confirmed onsite to contain contraband, constitute fruits of crime or to have been used to commit crime will not be returned but will be imaged offsite and analyzed as provided beginning at subparagraph (c) below.  The onsite confirmation may be provided by an owner or user of the computer or storage device or, if feasible, may be obtained by conducting a limited onsite forensic examination to determine if the subject media contains any contraband or otherwise is an instrumentality. Computers and other electronic storage devices and media that are not confirmed onsite as instrumentalities will be taken offsite for preliminary analysis in accordance with subparagraph (b) below.
>
> b.  The offsite imaging and preliminary analysis of computers, other electronic storage devices and media to confirm their status as instrumentalities will be conducted within forty-five (45) days of seizure. Seized items confirmed to be instrumentalities will not be returned and will be further analyzed as provided below.  If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the court.  An image of the items will be retained and subjected to a complete forensic analysis, as provided below.
> . . .
>
> Identification and Extraction of Relevant Data
> . . .
>
> h.  Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files.  The identification and extraction process may take weeks or months.  The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of imaging, absent further application to this court.

(ECF No. 16-2 at 17–19, 21).

On Monday November 7, 2011, all electronic media was turned over to HSI

1   Special Agent Buffington for processing.  Special Agent Buffington previewed five
2   items of electronic media that had been seized at the residence—the four laptops and one
3   flash drive.  Four pieces of electronic media previewed positive for the presence of child
4   pornography.[2]  Special Agent Buffington completed the forensic imaging of the Toshiba
5   laptop on November 9, 2011 (ECF No. 40-1 at 3); the HP 642-415DX on November 10,
6   2011 (ECF No. 40-1 at 9); the HP Pavilion on November 10, 2011 (ECF No. 40-1 at 16);
7   and the flash drive on November 14, 2011 (ECF No. 40-1 at 26).  Special Agent
8   Buffington copied the data onto the internal HSI servers.

9       Special Agent Buffington testified that he was familiar with the timelines in a
10  search warrant and that he keep track of those timelines when forensically examining
11  electronic media.  Special Agent Buffington testified that he worked on one or two cases
12  at a time and that he was asked to help other agents from time to time.  Special Agent
13  Buffington testified that his priority for forensic cases included "[a] case where there is
14  a hands-on molest, a case where there may be a foreign traveller [sic] that is trying to
15  leave the country and we need to look at his evidence . . . before he departs, cases of
16  national security."  (ECF No. 39 at 7).

17      Special Agent Buffington began his analysis of the electronic media in this case
18  for evidence of child pornography on November 18, 2011.  Special Agent Buffington
19  was out of the office on leave for part of the month of December 2011.  Upon his return
20  in January 2012, Special Agent Buffington flew to Florida to assist in a federal
21  investigation involving the exportation of aircraft parts to Iran.

22      The 90-day period for identification and extraction of evidence from the forensic
23  imaging of the Toshiba laptop ended on Wednesday, February 8, 2012; the 90-day
24  period for identification and extraction of evidence from the forensic imaging of the  HP
25  642-415DX ended on Thursday, February 9, 2012; the 90-day period for identification
26  and extraction of evidence from the forensic imaging of the  HP Pavilion ended on

27

28      [2] The Gateway computer was inoperable and did not preview positive for child
    pornography.

-14-

Thursday, February 8, 2012; and the 90-day period for identification and extraction of evidence from the forensic imaging of the flash drive ended on Sunday, February 12, 2012. Special Agent Buffington testified that he was not able to complete the analysis of Defendant's electronic media within ninety days of the imaging. Special Agent Buffington contacted Special Agent Myers to inform her that he needed an extension.

On Friday, February 10, 2012, Special Agent Myers prepared an application for a 90-day extension of time to complete the analysis of Defendant's electronic media. Special Agent Myers stated in her declaration to the Magistrate Judge that "preliminary review of the digital media identified suspect child pornography images and/or files" and that additional time was required to complete the analysis "because of the heavy case load of the unit and because of the large volume of computer data seized pursuant to the warrant. The assigned HSI Computer Forensic Agent will take due diligence to complete the forensic analysis of all remaining computer media within the requested 90 days." (ECF No. 25-8 at 25).

On Monday, February 13, 2012, the Magistrate Judge granted the extension, under which the new date to complete the analysis was May 13, 2012.

On May 9, 2012, Special Agent Myers applied for a second 90-day extension of time to complete the analysis of the electronic media. Special Agent Myers stated in her declaration to the Magistrate Judge that "preliminary review of the digital media identified suspect child pornography images and/or files" and that additional time was required to complete the analysis "because of the heavy case load of the unit and because of the large volume of computer data seized pursuant to the warrant. The assigned HSI Computer Forensic Agent will take due diligence to complete the forensic analysis of all remaining computer media within the requested 90 days." (ECF No. 25-8 at 28). On May 12, 2012, the Magistrate Judge granted the extension, under which the new date for the completion of the analysis was August 11, 2012.

On June 28, 2012, Special Agent Buffington completed his analysis of the electronic media.

**Contentions of Parties**

Defendant asserts that the failure of the Government to seek an extension of time to complete the analysis of the electronic media within ninety days of imaging mandates suppression of the evidence. Defendant asserts that the 90-day deadline had expired before the Government prepared the first application for an extension of time. Defendant contends that "the warrant becomes void if the forensic search is not executed or the time extended before the expiration date." (ECF No. 28 at 5). Defendant asserts that the request for an extension should properly be viewed as a part of the process of the issuance of the warrant and that Fed. R. Crim. P. 41 supports suppression. Defendant further contends that the "boilerplate assertion of a need for extension and a false promise of due diligence violates *Franks v. Delaware.*" (ECF No. 16-1 at 6).

The Government contends that the four-day lapse of time between the expiration of the 90-day period and the grant of an extension of time by the Magistrate Judge was, at most, a technical violation that does not require suppression of evidence. The Government asserts that a delay in searching seized electronic media does not present the same risk of diminishing probable cause presented by a delay in the initial execution of a search warrant. The Government asserts that there are no facts in this case which would demonstrated prejudice to Defendant or an intentional or deliberate disregard of Rule 41 on the part of the Government. The Government further contends that the agent completed the forensic examination within a reasonable period of time as required by the Fourth Amendment to the United States Constitution.

**Applicable Law**

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. "[T]he Supreme Court has repeatedly held that an essential function of the warrant is to assure the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *United*

1  *States v. Williamson*, 439 F.3d 1125, 1132 (9th Cir. 2006)(internal quotation marks and

2  citation omitted.).

3       The Fourth Amendment requires officials to execute searches and seizures in a

4  reasonable manner. *See United States v. Ankeny*, 502 F.3d 829, 836 (9th Cir. 2007)("It

5  is true that the manner in which a warrant is executed is subject to later judicial review

6  as to its reasonableness."); *United States v. Syphers*, 426 F.3d 461, 496 (1st Cir. 2005)

7  ("The Fourth Amendment itself contains no requirements about *when* the search or

8  seizure is to occur or the *duration* [of the search].") (emphasis added).  "The principle

9  that the exclusionary rule applies only when discovery of evidence results from a Fourth

10  Amendment violation is well-established." *Ankeny*, 505 F.3d at 837.

11       Rule 41 of the Federal Rules of Criminal Procedure provides that a warrant

12  authorizing the seizure of electronically stored information may "authorize[] a later

13  review of the media or information consistent with the warrant."  Fed. R. Crim. P.

14  41(e)(2)(B).  Electronic data searches may take longer than traditional searches because

15  "[e]lectronic storage facilities intermingle data, making them difficult to retrieve"

16  without close analysis "in a controlled environment." *United States v. Comprehensive*

17  *Drug Testing, Inc.,* 621 F.3d 1162, 1175 (9th Cir. 2010).

18                          **Ruling of the Court**

19       In this case, the digital evidence was seized on November 2, 2011 after the

20  Magistrate Judge found probable cause to seize items relating to violations of the child

21  pornography statute, specifically including "[a]ll computer systems, software,

22  peripherals and data storage devices." (ECF No. 16-2 at 5).    The "Procedures for

23  Electronically Stored Information" within the warrant provided in part: "The personnel

24  conducting the identification and extraction of data will complete the analysis within

25  ninety (90) days of imaging, absent further application to this court." (ECF No. 25-8 at

26  21).  The 90-day time period expired on February 8, 2012 for  the Toshiba laptop;

27

28

1  February 9, 2012 for the HP 642-415DX; and February 9, 2012 for the HP Pavillion.[3]

2  The motion for an extension of time was prepared by Special Agent Myers on Friday,

3  February 10, 2012 and presented to the Magistrate Judge.  The Magistrate Judge signed

4  the extension on Monday, February 13, 2012.  The application for the extension was

5  prepared and presented to Magistrate Judge two days after the expiration of the 90-day

6  period for the Toshiba Laptop and one day after the expiration of the 90-day period for

7  the HP laptops.   Under Rule 41(e)(2)(B), the application for an extension was not

8  requested within the 90-day period from imaging provided in the procedures set forth

9  in the warrant.

10         In *Williamson*, the Court of Appeals stated:

11         [W]e have repeatedly held—and have been instructed by the Supreme
           Court—that suppression is rarely the proper remedy for a Rule 41 violation.
12         The Supreme Court has stated that the Federal Rules of Criminal Procedure
           do not constitute a statutory expansion of the exclusionary rule. . . .

13         There are three circumstances under which evidence obtained in violation
14         of Federal Rule of Criminal Procedure 41 requires suppression: 1) the
           violation rises to a constitutional magnitude; 2) the defendant was
15         prejudiced, in the sense that the search would not have occurred or would
           not have been so abrasive if law enforcement had followed the Rule; or 3)
16         officers acted in intentional and deliberate disregard of a provision in the
           Rule.

17  *Id.* at 1132–1133. (internal quotation marks and citations omitted).

18         In this case, Special Agent Buffington previewed the electronic media and four

19  items of the electronic media previewed positive for the presence of child pornography.

20  Pursuant to the search warrant's "Procedures for Electronically Stored Information,"

21  Special  Agent  Buffington  confirmed  the  status  of  the  electronic  media  as

22  "instrumentalities [which] will not be returned and will be further analyzed as provided

23  below."  (ECF No. 16-2 at 18).  Special Agent Buffington began the analysis of the

24  electronic media on November 18, 2011 and had not completed the analysis within the

25

26         [3] The Court finds no delay in applying for an extension for the flash drive. The
27  90-day period for the flash drive ended on Sunday, February 12, 2011 and the
    Magistrate Judge signed the extension of time on Monday, February 13, 2011.
28

90-day period of imaging.  The delays of one day and two days in seeking an extension of the period for analysis  had no material effect on Defendant's rights under the Fourth Amendment.  There are no facts that would support any prejudice to Defendant or any intentional or deliberate disregard of the provisions of Rule 41on the part of the Government.

Unlike in *Franks v. Delaware,* 438 U.S. 154 (1978), there were no facts in support of probable cause at issue in the application for an extension made to the Magistrate Judge.  In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court examined the circumstances under which a defendant may "attack the veracity of a warrant affidavit after the warrant has been issued and executed." *Id*. at 164.  "A defendant is entitled to a *Franks* hearing only if he makes a two-fold showing: intentional or reckless inclusion or omission, and materiality." *United States v. Bennett*, 219 F.3d 1117, 1124 (9th Cir. 2000).  To make this showing, a defendant "must make specific allegations that indicate the portions of the warrant claimed to be false" and "[t]he allegations must be accompanied by a detailed offer of proof, preferably in the form of affidavits." *United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983).  In this case, Defendant did not identify any specific facts omitted and did not provide an offer of proof of any omitted facts necessary to a finding of probable cause.

In this case, the Court held an evidentiary hearing to allow Defendant to test the declaration of Agent Buffington filed by the Government in support of the opposition to the motion to suppress evidence.  (ECF No. 25-5).  While the Fourth Amendment requires agents to be truthful in applications to the court, and Rule 41 prohibits intentional or deliberate disregard of the Rules, the record in this case shows that the failure to apply for the extension within the 90-day period was a technical violation of Rule 41 which involved no intentional or reckless false statements or omissions and no prejudice to Defendant.

The Court concludes that the period of seven months and twenty-six days to complete the forensic examination of all the electronic media was reasonable in light of

13CR668-WQH

1  the size of the media seized and that the extensions by the Magistrate Judges were

2  reasonably granted. Within a month of the seizure, Special Agent Buffington previewed

3  all of the electronic media, found child pornography, copied the data, and began the

4  analysis. Special Agent Buffington prioritized his work based upon reasonable public

5  policy concerns. There are no facts in the record to support a violation of Defendant's

6  Fourth Amendment rights or the application of the exclusionary rule. Defendant's

7  motion to suppress evidence (ECF No. 16) is denied.

8  <center>**CONCLUSION**</center>

9    IT IS HEREBY ORDERED that 1) the motion to suppress statements (ECF No.

10  15) is DENIED and 2) the motion to suppress evidence (ECF No. 16) is DENIED.

11  DATED:  December 4, 2013

12  **WILLIAM Q. HAYES**
United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<center>-20-</center>